**Continuation of Application for Search Warrant**

I, Josh Reinsch, being duly sworn, depose and state as follows:

## I.   Introduction

1. I am a Special Agent with Homeland Security Investigations ("HSI"), and have been so employed since January 2010. I am currently assigned to the Grand Rapids, Michigan Resident Agency. Prior to being a criminal investigator, I worked for Michigan State University's Intelligence Training Program, funded by the Department of Homeland Security, to train federal, state, local, and tribal law enforcement agencies how to build and sustain intelligence capacities in their agencies. I received my Bachelor's and Master's degrees in Criminal Justice from Michigan State University.

2. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b), conspiracy to commit money

laundering, in violation of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

3. This Continuation arises from the Title III investigation described in the Continuation in Support of the Criminal Complaint filed on December 10, 2019, No. 1-19-MJ-420 (the Complaint Continuation), charging Andrew Rolando Bravo and nine others with conspiracy to distribute and possess with controlled substances in violation of 21 U.S.C. §§ 841, 846. I incorporate the Complaint Continuation by reference herein.

4. Because this Continuation is for the limited purpose of establishing probable cause to support the issuance of a search warrant against the proposed subject premises, it contains only a summary of relevant facts. I have not included each and every fact known to me or to other law enforcement officers concerning the entities, individuals, and events described in this Continuation.

5. This Continuation is made for the purpose of establishing probable cause in support of search warrant for Room 240 at the Quality Inn, 2590 Capital Ave SW, Battle Creek, MI 49015 (**Subject Premises 10**) occupied by defendant Wayne Henry HAWLEY a/k/a "Pint" for evidence of the commission of the crimes conspiracy to distribute and possess with the intent to distribute controlled substances in violation of Title 21, United States Code, Section 846; and possession of controlled substances with the intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

6.  The statements contained in this Continuation are based in part on: (a) my personal participation in this investigation; (b) information provided by other federal, state, and local law enforcement officers, (c) investigative reports; and (d) my training and experience and the training and experience of other law enforcement agents.

## PROBABLE CAUSE

7.  HAWLEY's involvement in the BRAVO DTO is well-documented in the Complaint Continuation, specifically on pages 25-26, 42-46, 47, 59, 79, 80, 100, 102-104, 106, 109-110, 115, 118-120, 130.

8.  Information provided to law enforcement by the Quality Inn shows that HAWLEY is staying in **Subject Premises 10** on a day-to-day rental basis.

### A. The BRAVO DTO has Used Hotels, Specifically the Quality Inn, of which Subject Premises 10 is a Room, To Support Its Operations

9.  As outlined in the Complaint Continuation, the BRAVO DTO has used hotels as meeting locations to complete drug transactions.

10. Indeed, BRAVO himself has frequented the Quality Inn located at 2590 Capital Ave SW, Battle Creek, MI 49015 on many occasions.  For example, on September 8, 2019, BRAVO reserved a room at the Quality Inn and was observed by law enforcement arriving there at approximately 8:05 PM.

11. Information provided by the hotel earlier in the investigation shows BRAVO staying at the hotel, which is in the same city that BRAVO resides, on the dates below:

    5/14/2017 to 5/14/2017 Room 117

      5/19/2017 to 5/21/2017 Room 301
      5/19/2017 to 5/21/2017 Room 307
      5/27/2017 to 5/28/2017 Room 130
      6/2/2017 to 6/3/2017 Room 140
      7/12/2017 to 7/18/2017 Room 148
      2/5/2018 to 2/6/2018 Room 306
      2/14/2018 to 2/15/2018 Room 311
      5/24/2018 to 5/25/2018 Room 151
      6/2/2018 to 6/3/2018 Room 306
      6/16/2018 to 6/17/2018 Room 302
      10/21/2018 to 10/22/2018 Room 236
      12/27/2018 to 12/28/2018 Room 134
      6/12/2019 to 6/13/2019 Room 149
      7/24/2019 to 7/25/2019 Room 246
      8/26/2019 to 8/28/2019 Room 104
      8/27/2019 to 8/28/2019 Room 234
      9/8/2019 to 9/9/2019 Room 132

12. Based on my training, experience, and familiarity with the investigation, I believe that BRAVO, HAWLEY, and other members of the BRAVO DTO have used the Quality Inn at 2590 Capital Ave SW, Battle Creek, MI 49015 to conduct drug transactions. I know that drug traffickers often utilize hotels as drug transaction locations in an attempt to evade law enforcement detection.

**B. HAWLEY Was Arrested In Subject Premises 10 on December 11, 2019**

13. On December 11, 2019, at approximately 6:00 AM, HAWLEY was arrested in **Subject Premises 10**. Law enforcement officers entered the premises for purposes of executing the arrest warrant issued in 1:19-MJ-420 based on probable cause established by the Complaint Continuation. In plain view, law enforcement officers observed a digital scale and marijuana.

14. Entry to **Subject Premises 10** is currently sealed at the direction of law enforcement.

15. I know from training and experience that subjects involved in drug trafficking often use their residences, businesses, vehicles, or other locations over which they maintain dominion and control to store drugs and otherwise further their drug trafficking. Drug traffickers frequently maintain quantities of drugs in their places of residence, along with packaging materials, scales for weighing drugs, and rubber or latex gloves to prevent the transfer of fingerprints and/or the contamination of drugs. Subjects also tend to keep currency, i.e., the proceeds of drug trafficking, and ledgers, notebooks, and other documentation whereby they track their purchases and sales of controlled substances. In addition to hard copy documents, drug traffickers often maintain records of their activities on electronic equipment such as computers and "tablet" mobile computing devices. Many, if not most, financial institutions now provide software applications ("apps") to their customers which permit the rapid movement of funds between and among financial accounts. Drug traffickers who move money through financial institutions to buy and sell drugs now may do so using home computers and tablet devices.

16. I also know from training and experience that drug traffickers frequently utilize mobile telephones to facilitate drug transactions. Drug traffickers rely upon voice phone services, SMS and MMS text messaging, social media instant messaging services, and electronic mail apps to communicate with suppliers, customers, and confederates. Mobile telephones are portable and phone providers often do not require purchasers or users of the devices to provide their true names and/or addresses, so drug traffickers often maintain multiple devices to avoid

detection by law enforcement. Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls; text messages; photographs of drugs, co-conspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time.

17. Lastly, to protect against theft, drug traffickers frequently keep firearms and ammunition on or about premises where they store drugs, currency, or other items of value. Because drug traffickers cannot report the theft of drugs, drug proceeds, or other items of value to law enforcement without substantial risk of their illicit activities being discovered, they themselves must "police" areas where drugs are bought, sold, and stored through the possession and use of firearms and other dangerous weapons.

18. Further, based upon my training, experience, and participation in financial investigations pertaining to the trafficking of large amounts of controlled substances, I am aware of the following:

    a. Drug traffickers often purchase or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies.

    b. Even though these assets are in names other than the drug traffickers', the traffickers actually own and continue to use these assets, and exercise dominion and control over them.

c. Drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going drug business.

d. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, and receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. These books, records, receipts, notes, and ledgers, are maintained where the traffickers have ready access to them, including their residences.

e. It is common for drug traffickers to secrete contraband, proceeds and records of drug transactions in secure locations within their residences, businesses, vehicles, or other locations over which they maintain dominion and control to ensure ready access to these items and to conceal them from law enforcement authorities; subjects involved in drug trafficking often have unexplained wealth and assets as they do not have jobs, nor do they report income on their state or federal tax returns. Subjects often use cash, money orders, cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from. Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets.

f. In order to accomplish this concealment, drug traffickers have built "stash" places within their residences, businesses, or vehicles for these items.

g. It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds. This evidence includes currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers. These and other items are maintained by the drug traffickers within their residences, businesses, vehicles, or other locations over which they maintain dominion and control.

h. Drug traffickers often utilize electronic equipment such as computers, facsimile machines, and currency counting machines to generate, transfer, count, record, and store the information.

i. When drug traffickers amass large proceeds from the sale of controlled substances, they attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and

    accountants, casinos, and other gambling activities, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes, and otherwise legitimate businesses that generate large quantities of currency.

j.  The sale of controlled substances generates large quantities of currency in small denominations (commonly referred to as "street money").

k.  It is common for drug traffickers to separate their "street money" by denomination and organize this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

l.  Small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried, and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions.

m.  Drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny from the Internal Revenue Service or other federal, state, or local agencies. The "source" of their income reported on tax returns can be falsely stated, misleading, or generic in terms. Copies of these returns are commonly kept by the traffickers in their residences and businesses.

      n.      Drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and telephone numbers of their associates in the trafficking organization.

      o.      Drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product, and they keep these photographs in their possession.

      p.      Unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances.

19. For the foregoing reasons, I believe there is probable cause to search **Subject Premises 10,** for evidence of the commission of the crimes conspiracy to distribute and possess with the intent to distribute controlled substances in violation of Title 21, United States Code, Section 846; and possession of controlled substances with the intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).